**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

NOKA-DAWN WARFIELD, :

                Plaintiff,

  -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
                Defendant. :

Case No. 3:08-cv-34

District Judge Thomas M. Rose
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v.*

*Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an

application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the

Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed applications for SSD and SSI in May, 2000, alleging disability from October, 1998. (Tr. 63). Plaintiff's applications were denied after a December 18, 2001, hearing before an administrative law judge and Plaintiff took no further appeal. (Tr. 25-37).

Plaintiff filed second applications for SSD and SSI on October 4, 2002, alleging disability beginning December 19, 2001, due to depression, irritable bowel syndrome, arthritis, chronic obstructive pulmonary disease, fibromyalgia, a bulging disc, and headaches. (Tr. 547-49; 1134-36; 575). Plaintiff's applications were denied initially and on reconsideration. (Tr. 512-23, 1137-47). A hearing and a supplemental hearing were held before Administrative Law Judge Melvin Padilla, (Tr. 1188-1223; 1224-42), who determined that Plaintiff is not disabled. (Tr. 467-84). The Appeals Counsel denied Plaintiff's request for review, (Tr. 456-59), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that Plaintiff met the insured status requirements of the Act through June, 2005. (Tr. 471, ¶ 1). Judge Padilla also found that Plaintiff has severe lumbar degenerative disc disease with residuals of fusion surgery, small fiber neuropathy/possible fibromyalgia, residuals of bunion surgeries, history of cardiac arrhythmia and pacemaker implantation, pain disorder, and affective disorder, but that she does not have an impairment or combination of impairments that meets or equals the Listings. *Id.*, ¶ 3; Tr. 474, ¶ 4. Judge Padilla then found that Plaintiff has the residual functional capacity to perform a reduced range of light work. (Tr. 475, ¶ 5). Judge Padilla then used sections 202.20 through 202.22 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded

4

that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 483, ¶ 10). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 484).

Plaintiff has several impairments which are not the focus of her Statement of Errors. (Doc. 11 at 3 n. 2). These include a history of a cardiac arrhythmia requiring placement of a pacemaker, a mild obstructive lung defect, a history of foot surgeries for bunions and hallus toe deformity, chondromalacia patella, and irritable bowel syndrome. *Id.*

A MRI of Plaintiff's cervical spine performed on June 25, 1998, revealed a minimal central disc bulge at C4-5 and C5-6 without herniation, stenosis, or foraminal narrowing. (Tr. 144). An EMG performed August 5, 1998, showed no evidence of radiculopathy, neuropathy, or myopathy. (Tr. 146).

On November 2, 1998, Plaintiff consulted with neurologist, Dr. Ranganathan for complaints of headaches, neck pain, and numbness of the arms and fingers in the past year. (Tr. 421-23). Dr. Ranganathan reported that Plaintiff had a positive Tinel's sign bilaterally, decreased reflexes in the left upper extremity, normal light touch and pinprick, and a normal motor exam. *Id.* Dr. Ranganathan identified Plaintiff's diagnoses as tension headaches, cervical spondylosis, and bilateral carpal tunnel syndrome vs. tenosynovitis. *Id.*

Treating rheumatologist, Dr. Ranginwala reported on May 11, 1999, that Plaintiff had complaints of right neck and right arm pain, physical examination revealed positive impingement in the right shoulder, minimal crepitation in the medial and lateral compartment of the right knee, and that she had tender points present in the right trapezii and the muscles of the right upper extremity. (Tr. 160-61). Dr. Ranginwala also reported that EMG and nerve conduction

5

testing, ANA, rheumatoid factor, sedimentation rate testing, and the triple phase bone scan of the right upper extremity were all normal. *Id.* Dr. Ranginwala identified Plaintiff's diagnoses as right upper extremity and right neck myofascial pain syndrome. *Id.*

On June 29, 1999, Plaintiff consulted with neurosurgeon Dr. Cole who reported that Plaintiff's November, 1998, MRI showed minimal disc bulging, and that her physical examination was normal and he identified Plaintiff's diagnoses as mild degenerative disc disease of the cervical spine. (Tr. 169-70). Dr. Cole opined that there was no need for surgical intervention. *Id.*

Plaintiff treated with Dr. Belfie from July 30, 1999, through October 11, 1999. (Tr. 175-80). Dr. Belfie initially reported that Plaintiff's had tenderness in the temporalis muscles in the cranial area as well as in the suboccipital region in the myofascial structures and that he was able to reproduce Plaintiff's discomfort with palpation of the cervical, thoracic, and shoulder girdle paraspinal muscles more on the right than on the left with tissue texture abnormalities. *Id.* Dr. Belfie determined that Plaintiff's diagnoses were cervical, thoracic, and shoulder girdle myofascial strain, cervical degenerative joint disease, and degenerative disc disease per previous cervical spine MRIs. *Id.* Dr. Belfie recommended physical therapy and trigger point injections for myofascial strain. *Id*. Over time, Plaintiff reported temporary relief from trigger point injections, but that the physical therapy did not improve her pain. *Id.* On October 11, 1999, Dr. Belfie reported that Plaintiff's neurological examination was normal, that he was able to reproduce her discomfort with palpation of the cervical, thoracic, and shoulder girdle myofascial areas bilaterally, that Plaintiff was to pursue treatment for TMJ, that subsequently she might benefit from another series of trigger point injections, and that upon completion, he would release her for work with no restrictions. *Id.*

An MRI of Plaintiff's cervical spine performed on August 11, 2000, revealed a small

disc bulge at C4-5 and C5-6 with no evidence of canal stenosis. (Tr. 250).

Plaintiff sought mental health treatment at Mental Health Services for Clark County on August 30, 2000. (Tr. 398-406). At the time of her initial evaluation, Plaintiff stated that she was overwhelmed by being sick, it was noted that her mood was depressed, she was alert, oriented, and logical, and that she denied any suicidal ideation. *Id.* The evaluator identified Plaintiff's diagnosis as depressive disorder and Plaintiff was assigned a Global Assessment of Functioning (GAF) of 40. *Id.* On October 10, 2000, Plaintiff was seen by psychiatrist Dr. Smith for a medication review and he prescribed Remeron. *Id.* On November 20, 2000, Plaintiff reported that her mood was improving. *Id.*

Examining neuropsychologist Dr. Tanley reported on September 19, 2000, that Plaintiff graduated from high school, her affect was bland, psychomotor activity was within acceptable limits, she exhibited no manifestations of anxiety, and that she was alert and oriented. (Tr. 251-53). Dr. Tanley also reported that Plaintiff's judgment was sufficient to make life decisions and conduct her own living arrangements, that her level of intellectual functioning was in the low average range, and that her diagnosis was adjustment disorder with depressed mood. *Id.* Dr. Tanley assigned Plaintiff a GAF of 70 and opined that her ability to relate ot others was unimpaired, she was able to understand and follow simple instructions, and that she was mildly impaired in her ability to withstand and stress and pressure of daily work. *Id.*

Nerve conduction studies performed on January 25, 2001, were supportive of mild right carpal tunnel syndrome. (Tr. 418). Dr. Ranganathan continued to treat the Plaintiff medically with Neurontin and Darvocet for her reported headaches and neck pain. (Tr. 416-17).

An MRI of Plaintiff's cervical spine performed on January 31, 2001, revealed

degenerative changes of the mid and lower cervical spine with small, non-compressive central disc protrusion at the C5-C6 level. (Tr. 369).

Plaintiff continued to receive mental health treatment at Mental Health Services of Clark County during the period June, 2001, through April, 2003. (Tr. 761-76). During that time, Plaintiff saw a counselor for individual therapy and Dr. Smith for medication monitoring. *Id.* On January 4, 2002, Dr. Smith noted that Plaintiff was doing well overall, but that while Plaintiff had improved, she was "not able to focus and concentrate well enough to tolerate stress of work environment." *Id.*

Dr. Khan began treating Plaintiff in May, 2001, and she treated Plaintiff about once a month from December, 2002, to July, 2003. (Tr. 880-918). On July 22, 2002, Dr. Kahn reported that Plaintiff had multiple medical problems, that she was able to stand/walk and sit each for one hour in an eight-hour day and for one hour without interruption, lift/carry up to five pounds occasionally, and that she was unemployable. *Id.* On July 15, 2003, Dr. Khan reported that Plaintiff had severe neck and back pain due to a herniated disc, that she was able to stand/walk for two hours in an eight-hour day and for one-half hour without interruption, sit for one hour in an eight-hour day and for one-half hour without interruption, and lift up to five pounds occasionally. *Id.* Dr. Khan again opined that Plaintiff was unemployable. *Id.* Dr. Khan reported in September, 2004, that Plaintiff had severe fibromyalgia with repeated falls, was not able to lift/carry any weight, could stand/walk for one hour in an eight-hour day and for one hour without interruption, sit for four hours in an eight-hour day and for one hour without interruption, was not able to perform either light or sedentary work, would be absent from work more than three times a month due to her impairments, was not able to perform any work-related mental activities, had marked restrictions of activities of

daily living, marked difficulties in maintaining social functioning, and marked deficiencies in concentration. *Id.*

Plaintiff was hospitalized September 21-27, 2002, for treatment of major depression. (Tr. 692-99). At the time Plaintiff was admitted it was noted that Plaintiff was very sad, tense, withdrawn, and depressed, was having active suicidal thoughts, had issues of coping with increasing family stress, missing her husband and loss of visiting privileges to see her in prison, and was struggling with chronic medical problems. *Id.* Plaintiff was treated with group and individual therapy and medication and her condition improved. *Id.* Plaintiff was discharged with the diagnosis of major depression, recurrent and severe without psychotic features and she was assigned a discharge GAF of 63. *Id.*

On November 25, 2002, Dr. Ranginwala reported that Plaintiff had osteoarthritis in the hands and Raynaud's Disease that "may interfere with excessive writing." (Tr. 759).

Examining physician Dr. Padamadan reported on January 2, 2003, that Plaintiff had normal range of cervical spine motion, no trigger points of fibromyalgia in the anterior or posterior aspect of the chest, in the hip areas, or on the anterior superior iliac spines, normal hands, normal ranges of motion of the hips, knees, and ankles, and that she was alert and oriented. (Tr. 718-32). Dr. Padamadan also reported that based on his clinical evaluation of Plaintiff, she did not have any limitation of physical activities. *Id.*

Examining psychologist Dr. Payne reported on February 21, 2003, that Plaintiff has been receiving mental health treatment for two or three years, was hospitalized for mental health treatment in 2002, graduated from high school, walked slowly, and that her seated posture was appropriate. (Tr. 752-56). Dr. Payne also reported that Plaintiff's affect appeared fairly appropriate,

9

she did not appear to have any thought disorder, had a large number of physical complaints and presented with some vague and unspecific symptoms, and that her consciousness was somewhat distracted. *Id.* Dr. Payne noted that Plaintiff was oriented and that her intellectual capabilities appeared to be in the below average range. *Id.* Dr. Payne identified Plaintiff's diagnoses as major depression, recurrent, generalized anxiety disorder, and psychological factors affecting medical condition and he assigned her a GAF of 44. *Id.* Dr. Payne opined that Plaintiff's abilities to relate to others was moderately to markedly impaired, she was able to understand moderately complex task-related instructions, her concentration and attention was moderately to markedly impaired, and that she was markedly impaired in her ability to withstand the stress and pressures of day-to-day work activity. *Id.*

An EMG performed in March, 2003, and one performed in May, 2005, showed a mild left C6-7 radiculopathy. (Tr. 973; 1048). A CT of Plaintiff's lumbar spine performed on March 23, 2003, revealed mild disc bulging with a focal bulge at L4-L5. (Tr. 935).

On April 21, 2004, Plaintiff first consulted with neurologist Dr. Kissel who reported that Plaintiff's peripheral motor examination was compromised due to tendency to give-way, she had a positive Hoover's sign at both hips, normal strength in the upper extremities with questionable mild proximal weakness in the lower extremities, and that her reflexes and sensory exam were normal. (Tr. 919-23). Dr. Kissel also reported that Plaintiff's gait was narrow based, she had some difficulty tandem walking, could get out of a chair but needed a bilateral hand assist, could not squat below 10-20 degrees, and that her Romberg was negative. *Id.* Dr. Kissel noted that his working hypothesis was that Plaintiff's complaints were a manifestation of her fibromyalgia with perhaps some low back root disease. *Id.* On June 30, 2004, Dr. Kissel reported that formal testing again

revealed ratchety, give-away weakness with diffuse tenderness in all major muscle groups, that Plaintiff's tenderness was in all the classic fibromyalgia points as well as in other muscles, and that her reflexes and sensory exam were normal. *Id.* Dr. Kissel reported on September 17, 1004, that Plaintiff's test results were compatible with a length-dependent distal small fiber neuropathy and a grade 2 orthostatic hypotension and that small fiber neuropathy was commonly seen in patients with fibromyalgia. *Id.*

A September 2, 2004, nerve conduction study revealed mild denervation changes in the left ulnar motor distribution and a cubital tunnel syndrome could not be ruled out. (Tr. 962). A CT of Plaintiff's lumbar spine CT performed on October 14, 2004, was normal. (Tr. 930). On December 6, 2004, a lumbar discogram revealed mild-moderate concordant pain at L3-4, severe pain at L4-5, and less severe pain at L5-S1. (Tr. 993). A post-discogram CT confirmed the discogram findings. (Tr. 994-95).

Dr. Ranganathan reported in January, 2005, that Plaintiff's diagnoses were headaches, fibromyalgia, cervical/lumbar strain, lumbar disc bulge, and cubital tunnel syndrome, that she was not able to perform most work-related mental activities, and that she was markedly restricted in activities of daily living, had marked difficulties in maintaining social functioning, and had marked deficiencies in concentration. (Tr. 945-57). Dr. Ranganathan also reported that Plaintiff was able to lift/carry up to five pounds occasionally, stand/walk for one to two hours without interruption, sit for one to two hours in an eight-hour workday, that she was not able to perform light or sedentary work, and that she was totally disabled. *Id.*

On January 13, 2005, Plaintiff underwent a lumbar fusion with pedicle screw fixation at L4-5 and L5-S1 which Dr. Cole performed. (Tr. 980–87, 993-95). Dr. Cole reported that

Plaintiff's post-surgical examination revealed decreased range of motion but normal strength and sensation. (Tr. 980, 996, 998, 1001, 1004, 1074, 1076, 1078). Dr. Cole also reported that Plaintiff had a normal gait and full strength in her legs, no neurological deficits, and full ranges of motion other than in her spine. *Id.* Initially, Plaintiff's incision showed good healing and x-ray's showed the fusion was intact. (Tr. 1003-04). By mid-February 2005, Plaintiff began having some drainage from the wound and she was subsequently admitted to the hospital for intravenous antibiotic treatment. *See,* Tr. 1122. By late February 2005, the infection appeared to be resolved. *Id.*

An EMG performed on March 10, 2005, revealed bilateral mild to moderate carpal tunnel syndrome and a moderate left cubital tunnel syndrome. (Tr. 1048).

On June 8, 2005, a CT of the lumbar spine showed findings "suggestive of loosening involving the S1 pedicular screws as some halo effect around the screws." (Tr. 1082).

Plaintiff treated with pain specialist, Dr. Watson, from April 13, 2005, to August 15, 2005. (Tr. 1093-1121). Dr. Watson noted at the time of his initial examination of Plaintiff that she reported that she felt much worse since her surgery, her gait was stiff, she had only 20 degrees of forward flexion, and that there was tenderness at the facet joints from L2-S1. *Id.* Dr. Watson suspected a lumbar facet syndrome and he began Plaintiff on a series of facet joint injections. *Id.* Dr. Watson noted that Plaintiff reported that she had 50% relief of her pain for two weeks following the injections. *Id.* Dr. Watson subsequently administered a selective nerve root injection and Plaintiff reported that her pain was only dulled for one and one-half days by this injection. *Id.* Over time, Dr. Watson performed several injections. *Id.*

Examining psychologist Dr. Taney reported on July 19, 2005, that Plaintiff demonstrated much pain behavior sitting stiffly and moving slowly, tended to move frequently, did

not seem to exaggerate her symptoms, and that her affect was a bit brittle. (Tr. 1031-33). Dr. Taney also reported that Plaintiff saw a therapist on a regular basis, her psychomotor activity was reduced, she exhibited no evidence of a formal thought disorder, was alert and oriented, and that her recent and remote memory was superficial to poor. *Id.* Dr. Taney noted that Plaintiff's judgment was sufficient to make life decisions and conduct her own living arrangements, and that her intellectual functioning appeared to be in the borderline range. *Id.* Dr. Taney identified Plaintiff's diagnoses as adjustment disorder with mixed anxiety and depression, chronic, borderline intelligence, and pain disorder associated with a general medical condition and he assigned Plaintiff a GAF of 60. *Id.* Dr. Taney opined that Plaintiff's ability to relate to others was moderately impaired by her pain behavior and that she was able to understand and follow simple instructions and maintain attention to perform simple, repetitive tasks within the context of borderline intelligence. *Id.*

Examining physician Dr. Duritsch reported on August 10, 2005, that Plaintiff walked with the use of a cane, her upper and lower extremity active ranges of motion were normal, there was no focal weakness in her arms or legs, sensation was intact in her upper extremities, and that she stated that she could not flex forward. (Tr. 1021-30). Dr. Duritsch also reported that his clinical assessment was a recent posterior lumbar fusion at L4-L5 and L5-S1 now with loosening of the pedicle screw at S1 as well as a postoperative infection, history of DeQuervain's release with no abnormalities of the right thumb, history of bilateral carpal tunnel releases and bilateral lunar nerve releases with ongoing tingling in the hands bilaterally, history of arthroscopic surgery for cartilage injuries to the right knee with no evidence of instability or limitation or range of motion, and depression and anxiety. *Id.* Dr. Duritsch opined that Plaintiff was able to lift up to 10 pounds, stand and walk each for 15 minutes at a time and for one to two hours total, and sit for 15 to 30 minutes

at a time and two to three hours total. *Id.*

On December 2, 2005, Dr. Smith and Ms. Daily, Plaintiff's therapist, jointly reported that they were treating Plaintiff for a major depressive disorder, that Plaintiff was not able to perform any work-related mental activities, that she had marked restrictions of activities of daily living, extreme difficulties in maintaining social functioning, and extreme deficiencies of concentration. (Tr. 1061-73). Dr. Smith and Ms. Daily also reported that Plaintiff had fair to poor to no abilities to make occupational adjustments, performance adjustments, and personal-social adjustments. *Id.*

The medical advisor (MA) testified at the hearing that Plaintiff did not meet or equal the Listings. (Tr. 1227-38).

Plaintiff alleges in her Statement of Errors that the Commissioner erred by improperly weighing her treating physicians' opinions, Dr. Duritsch's opinion, and her treating mental health care providers' opinions. (Doc. 11).

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir. 2007), *citing, Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)). In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242, (6th Cir. 2007), citing *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse,* 502 F.3d at 540 (alteration in original) (quoting 20 C.F.R. § 404.1502). However, a treating physician's statement that a claimant is

14

disabled is of course not determinative of the ultimate issue. *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986). A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994).

The reason for the "treating physician rule" is clear: the treating physician has had a greater opportunity to examine and observe the patient. *See, Walker v. Secretary of Health and Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992). Further, as a result of his or her duty to cure the patient, the treating physician is generally more familiar with the patient's condition than are other physicians. *Id.* (citation omitted).

While it is true that a treating physician's opinion is to be given greater weight than that of either a one-time examining physician or a non-examining medical advisor, that is only appropriate if the treating physician supplies sufficient medical data to substantiate that opinion. *See, Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983); *see also, Bogle v. Sullivan,* 998 F.2d 342 (6th Cir. 1993). A treating physician's broad conclusory formulations regarding the ultimate issue of disability, which must be decided by the Commissioner, are not determinative of the question of whether an individual is under a disability. *Id.* Further, the Commissioner may properly reject a treating physician's opinion if it is not supported by sufficient medical data or if it is inconsistent with the other evidence of record. *Cf., Kirk, supra; see also, Walters, supra.*

Plaintiff essentially challenges the Commissioner's rejection of Drs. Kahn's and Ranganathan's opinions that she is disabled.

15

In rejecting Drs. Kahn's and Ranganathan's opinions, Judge Padilla essentially determined that those opinions were not supported by those physicians' objective findings and were inconsistent with other evidence of record. (Tr. 476-78). This Court agrees.

First, the record reveals that Dr. Kahn's contemporaneous records contain few, if any, objective medical findings. *See,* Tr. 905-18. Indeed, Dr. Kahn's records are primarily a recitation of Plaintiff's subjective complaints. Further, although Dr. Kahn opined that Plaintiff is disabled, she provided few objective findings to support his opinion.

Similarly, Dr. Ranganathan's clinical notes contain few objective findings and are essentially recitations of Plaintiff's subjective complaints. *See,* Tr. 416-17; 421-23. Further, Dr. Ranganathan provided few, if any, objective findings to support his opinion that Plaintiff is totally disabled.

In addition, Dr. Kahn's and Dr. Ranganathan's opinions are inconsistent with the other evidence of record. For example, as noted above, Dr. Cole reported few objective findings and specifically noted that Plaintiff had no positive neurological findings. In addition, Dr. Padamadan noted that Plaintiff's clinical findings were essentially within normal limits and that she had no limitation of physical activity. Further, Dr. Kahn's and Dr. Ranganathan's opinions are inconsistent with the MA's opinion as well as with the reviewing physicians' opinions. *See,* Tr. 733-39.

Plaintiff essentially argues that the Commissioner erred by rejecting examining physician Dr. Duritsch's opinion particularly since it supports Drs. Kahn's and Ranganathan's opinions that she is disabled. However, the issue is not whether the record supports Plaintiff's allegation of total disability, but whether there is substantial evidence to support the Commissioner's decision that Plaintiff is not disabled.

16

Although Dr. Duritsch opined that Plaintiff's residual functional capacity was inconsistent with the ability to perform substantial gainful activity, his clinical findings do not support his conclusion. Indeed, Dr. Duritsch relied, at least in part, on Plaintiff's subjective complaints in reaching his conclusion. Additionally, Dr. Duritsch reported few, if any, objective findings which support his opinion. Finally, as with Drs. Kahn and Ranganathan, Dr. Duritsch's opinion is inconsistent with the other evidence of record.

Under these facts, the Commissioner did not err by rejecting Dr. Kahn's, Dr. Ranganathan's, and Dr. Duritsch's opinions.

Plaintiff argues next that the Commissioner erred by rejecting her mental health care providers' opinions that she is disabled by her alleged mental impairment.

Although Dr. Smith and Ms. Daily essentially opined that Plaintiff is disabled by her mental impairment, their opinions are not supported by their clinical records and are inconsistent with other evidence of record. For example, the mental health clinical notes reveal that over time, Plaintiff reported that she was doing "fairly well" and that her mood had improved. In addition, most of the mental health clinical notes are recitations of Plaintiff's subjective complaints and contain few objective observations by the mental health care providers. Further, Plaintiff's complaints revolved primarily around her relationships with boyfriends, mother, and sons.

Under these facts, the Commissioner had an adequate basis for rejecting the extreme limitations which Dr. Smith and Ms. Daily described when evaluating Plaintiff's ability to perform work-relate mental activities.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686

(S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

December 29, 2008.

*s/ Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).